UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
:
KLICKADS, INC., D/B/A BROKERSNYC,                    :
:
                     Plaintiff,                         :
:
           v.                                            :
:
REAL ESTATE BOARD OF NEW YORK, INC.,                 :
BROWN HARRIS STEVENS RESIDENTIAL SALES,              :
LLC, TERRA HOLDINGS, LLC, HALSTEAD                   :    **OPINION**
PROPERTY, LLC, WILLIAM B. MAY, CO., INC.,            :
HERON PROPERTIES REALTY LTD., FOX                    :    04 Civ. 8042 (LBS)
RESIDENTIAL GROUP, INC., PRUDENTIAL REAL             :
ESTATE AFFILIATES, INC., STRIBLING &                 :
ASSOCIATES LTD., STEVEN SPINOLA, HALL S.             :
WILKIE, BARBARA FOX, BELLMARC REALTY,                :
ON-LINE RESIDENTIAL, INC., REALPLUS, LLC,            :
SOUTHEBY'S INTERNATIONAL REALTY, INC.                :
and THE CORCORAN GROUP, INC.,                        :
:
                     Defendants.                        :
:
------------------------------------------------------------------x

Appearances:

*For Plaintiff:*
Andrew D. Friedman
Glancy Binkow & Goldberg LLP
430 Park Avenue, Suite 702
New York, NY 10022

*For Defendants:*
Bruce H. Schneider, Claude G. Szyfer, Sandra Rampersaud, Michael Fox
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038


SAND, J.

       Plaintiff, Klickads, Inc., d/b/a BrokersNYC (BrokersNYC), a listings information

technology (IT) firm that sells listings databases and other IT products to real estate brokerage

firms in New York, brought this antitrust action against the Real Estate Board of New York, Inc.

1

(REBNY), a real estate industry trade association, several brokerage firms that are members of REBNY and their employees, and two of its competitors, RealPlus LLC and On-Line Residential, Inc. (OLR), alleging violations of section 1 and section 2 of the Sherman Act, 15 U.S.C. §§ 1-2 (2000), violation of New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, and tortious interference with economic relations.  Before the Court is defendants' motion for summary judgment on all claims.

## I

Unless otherwise noted, the following facts are not disputed in any material way:

Prior to 2002, residential real estate brokers in Manhattan did not necessarily share their exclusive sales or rental listings with other brokers.  In order to capture the entire commission on a transaction, many listing brokers tried to find a buyer themselves rather than offer the listing to other brokers who would then share in the commission if they found a buyer.  Brokers who did share listings, did so on a voluntary ad-hoc basis.  Unlike many localities throughout the country, the majority of brokers in Manhattan do not subscribe to a centralized multiple listing service (MLS) through which they would be required to share exclusive listings with other subscribers through a centralized database.  Sharing listings through some sort of mandatory co-brokerage agreement, like an MLS, helps property sellers by placing their listing in front of a wider audience of buyers and helps buyers by increasing the pool of properties available through a single broker.  In short, an MLS has many procompetitive virtues.  See, e.g., Pomanowski v. Monmouth County Bd. of Realtors, 89 N.J. 306, 318 (1982).

Because Manhattan has no centralized MLS database that all subscribing brokers can access, each brokerage firm must maintain its own database of listings.  Some firms do this in-

house with their own listings management systems, which allow them to electronically store, access, and search listings. These firms must therefore purchase computer systems from a listings IT vendor and employ listings staffs to compile listings, enter them into the database, and remove old listings. Other firms (especially smaller firms) outsource their listings management to companies, like plaintiff and defendant OLR, that employ a listings staff to maintain a listings database and then sell subscriptions to brokerage firms to access that database. By outsourcing to vendors like plaintiff, brokerage firms can avoid the high upfront cost of acquiring an in-house listings management system.

In 2002, REBNY, a trade association whose members make up the bulk of residential real estate brokers in Manhattan, implemented mandatory co-brokerage rules requiring its members to share their exclusive residential listings with other REBNY members within 72 hours. Initially, REBNY members were permitted to share their listings by fax, by email, or, if they were RealPlus customers, electronically through RealPlus's R.O.L.E.X. data transmission system. When listings were shared by fax or email, each firm had to manually input the shared listings into their own listings database.

Defendant RealPlus, a listings management IT vendor owned by Eric Gordon and Terra Holdings (the parent company of brokerage defendants Brown Harris Stevens and Halstead), developed a data transmission system called R.O.L.E.X., which allows listings data to be shared seamlessly between different in-house listings management systems, thus eliminating the need for listings staff to manually input listings transmitted by R.O.L.E.X. from one RealPlus system to another. RealPlus also created interfaces with the in-house listings management systems at four large brokerage firms—defendants Prudential Douglas Elliman, Corcoran, Stribling, and

Bellmarc—allowing them to use R.O.L.E.X. to share listings with each other and with RealPlus systems.

In April 2003, REBNY changed the co-brokerage rules to no longer allow listings to be shared by fax.  Around that time, at the request of several REBNY members who used defendant OLR's service as their listings database, REBNY created a universal email address for OLR allowing listings to be shared by email directly with OLR.  Although plaintiff requested that REBNY create a similar email address for BrokersNYC and later forwarded requests from several REBNY members who used BrokersNYC's services, REBNY did not create a universal email address for BrokersNYC.  In an internal memo dated April 29, 2003, REBNY outlined a "twenty-five firm policy" for listings IT vendors seeking a universal email address.  In sum, REBNY would only provide a universal email address if the vendor could show that it had at least twenty-five clients who were currently members in good standing of REBNY's co-brokerage program.  (Mem. from Deborah Beck, Friedman Decl. Ex. 82.)  The memo also noted that only OLR and RealPlus had over twenty-five clients who were REBNY members.  (Id.)

In June 2004, REBNY announced that as of January 2005 all listings would have to be exchanged over the R.O.L.E.X. data transmission system.  Around the same time, REBNY was engaged in discussions with Eric Gordon and Terra Holdings, the owners of RealPlus, about purchasing either the R.O.L.E.X. standard or an equity stake in RealPlus.  In these negotiations, RealPlus consistently took the position that other than the four firms that already had a R.O.L.E.X. interface (defendants Prudential Douglas Elliman, Corcoran, Stribling, and Bellmarc) who would be grandfathered in, no additional interfaces would be created and all brokerage firms wishing to use R.O.L.E.X. would have to use RealPlus as their listings management system.  (See, e.g., Friedman Decl. Exs. 99, 101, 105.)

Eventually, however, at REBNY's request, RealPlus agreed to create a R.O.L.E.X. interface for OLR giving OLR customers access to real time seamless listings updates, just like RealPlus customers.  In an email to RealPlus owner Eric Gordon, Dianne Ramirez, President of Halstead and Co-Chair of the board of directors of the residential division of REBNY, explained that REBNY wanted RealPlus to create an interface for OLR to appease a "major player" brokerage firm CitiHabitats, an OLR customer, and to avoid a potential antitrust lawsuit by OLR. (Friedman Decl. Ex. 103.)  Plaintiff and another listings IT vendor, VLS (which has since gone out of business), made several requests for a data interface with R.O.L.E.X. on the same terms as OLR and offered to pay any costs that would be incurred in creating such an interface.  RealPlus, however, did not create an interface and REBNY declined to do anything to encourage RealPlus to create an interface with plaintiff or VLS.

Once REBNY had mandated the use of R.O.L.E.X. to exchange listings, the only way for brokerage firms who did not use RealPlus or OLR to participate in the co-brokerage arrangement, which was renamed the REBNY Listing Service (RLS), was to use a link on the REBNY website to input and access listings data.  Although the website link was open to all REBNY members, including plaintiff's clients, it was an inferior alternative to an interface with R.O.L.E.X.  While R.O.L.E.X. provided real time and seamless updates to users' listings databases, the data available on the website was only updated periodically and still required listings staff to input manually the listings from the website into an in-house listings database. Thus brokers who did not use RealPlus or OLR had to give up access to crucial real time updates to listings data.

According to plaintiff's expert, in 2002 sales for plaintiff, RealPlus and OLR each represented about a third of the market for listings IT services in Manhattan, which plaintiff

5

contends is the relevant market for antitrust analysis. By 2006, plaintiff claims that RealPlus's market share in Manhattan had grown to over 70% while plaintiff's had fallen to 13%. (Ludwick Decl. ¶ 18.) RealPlus and OLR's shares of the national market for listings IT services, which defendants contend is the relevant market for antitrust analysis, is slight. Plaintiff alleges that the brokerage defendants collectively make up over 80% of the residential real estate brokerage market in Manhattan and control the board of the residential division of REBNY.

## II

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (2000). "To establish a § 1 violation, a plaintiff must produce evidence sufficient to show: (1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either per se or under the rule of reason." Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 95-96 (2d Cir. 1998).

### A. Concerted Action

To meet the concerted action requirement of a section 1 claim, plaintiff must show that at least two distinct legal entities formed a "conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 768 (1984). Concerted action may be proven by direct evidence of an explicit agreement or by circumstantial evidence of an informal or tacit agreement. See Apex Oil Co. v. DiMauro, 822 F.2d 246, 252-53 (2d Cir. 1987); see also Reazin v. Blue Cross Blue Shield of Kansas, Inc., 899

F.2d 951, 963 (10th Cir. 1990). However, the range of permissible inferences that can be drawn from ambiguous evidence is limited in an antitrust case. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). To survive a motion for summary judgment, a plaintiff must point to evidence "that tends to exclude the possibility that the alleged conspirators acted independently." Id.

Plaintiff points to two types of concerted action that it argues give rise to section 1 liability. First, plaintiff argues that the rules and actions of REBNY as an association of brokers constitute concerted action by its member firms—namely the brokerage defendants. More specifically, plaintiff argues that the member brokerage firms agreed through REBNY that they would use only one type of transmission system (R.O.L.E.X.) provided by only two suppliers on the approved vendors list pursuant to the twenty-five firm rule (RealPlus and OLR) to exchange listings and that this agreement restricted competition between the firms by preventing them from seeking cheaper or more effective transmission systems.

Defendants are correct to note that not every action by a trade association is concerted action by the association's members. AD/SAT v. Associated Press, 181 F.3d 216, 234 (2d Cir. 1999). The Second Circuit has noted that "[t]o the extent that [trade associations] are buying and selling [products or services] in their own right, they can be fairly regarded as single entities whose selling decisions are not 'price fixing conspiracies' and whose buying decisions are not 'boycott conspiracies' of rejected suppliers." Id. (quoting 7 Phillip E. Areeda et al., Antitrust Law ¶ 1477) (alterations in original). But neither is every action of a trade association immune from antitrust scrutiny. The Second Circuit also noted that there is no conceptual difficulty in treating trade associations as continuing conspiracies when they regulate areas where their members are in competition. Id. (citing 7 Areeda § 1477). Accordingly, "an antitrust plaintiff

7

must present evidence tending to show that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective." Id.

In this case, plaintiff has raised a genuine issue of fact as to whether the brokerage defendants acted in concert to restrain trade through REBNY. Plaintiff points to decisions by REBNY's board of directors, where a majority of the seats are controlled by the brokerage defendants, that affect competition between REBNY members—namely adopting the twenty-five firm policy and designating approved and preferred vendors. These were not the types of purchasing or hiring decisions in the everyday operation of a trade association that Professor Areeda and the Second Circuit in AD/SAT cautioned against construing as concerted action. See 181 F.3d at 234. Whether these decisions were unreasonable restraints of trade is a separate inquiry from whether the defendants acted in concert. Plaintiff also points to circumstantial evidence that tends to support a motive for establishing policies to exclude plaintiff. Several of the brokerage defendants were owned by the same parent company as RealPlus giving them a direct financial stake in eliminating plaintiff as a competitor. Plaintiff also argues that all of the brokerage defendants, as large brokerage firms in Manhattan, had an incentive to keep plaintiff's subscription services for small brokers off the market to maintain their competitive advantage with pricey in-house listings management systems. In short, whether the brokerage defendants "consciously committed themselves," through REBNY, to exclude plaintiff from participation in the RLS as a preferred or approved vendor, is a question of fact for the jury.

The second type of concerted action that plaintiff alleges is an agreement between RealPlus and REBNY to promote RealPlus's services and to create high barriers of entry for RealPlus's competitors. Plaintiff alleges that REBNY and RealPlus agreed that, beyond the four

8

brokerage firms which were grandfathered in and eventually OLR, no new interfaces to the R.O.L.E.X. transmission system would be created. Thus all new participants in the RLS who wanted real time access to listings would have to use RealPlus or OLR.

Plaintiff offers no direct evidence of an explicit agreement between REBNY and RealPlus on the creation of new interfaces, but points to several pieces of circumstantial evidence. Before REBNY announced its rule that all listings must be exchanged over R.O.L.E.X. and while REBNY was in negotiations with Eric Gordon and Terra to purchase an equity stake in RealPlus or just the R.O.L.E.X. transmission system, Gordon insisted that a condition of any deal would be:

> An agreement with REBNY that, other than the firms already grandfathered in, all firms wishing to utilize R.O.L.E.X. must use RealPlus as the front end for maintaining listings. No additional interfaces would be created. By having firms grand-fathered in, the four firms that have already created a RealPlus interface: Corcoran, Elliman, Stribling, and Bellmarc would be protected. All other firms would be required to use RealPlus.

(Friedman Decl. Ex. 101.) This condition created problems for REBNY because CitiHabitats, a "major player" wanted to continue to use OLR. Eventually RealPlus agreed to create an interface for OLR and REBNY mandated the use of R.O.L.E.X. as the exclusive means to exchange listings in real time on the RLS. Plaintiff has pointed to no evidence of any explicit agreement, but a jury could reasonably infer that an implicit term of this agreement was that REBNY and RealPlus would not create any more R.O.L.E.X. interfaces. Again the common ownership of RealPlus and several brokerage defendants who control a substantial number of REBNY's board seats provides circumstantial evidence of a motive to reduce the competition faced by RealPlus that would tend to exclude the possibility that REBNY and RealPlus acted independently. This is sufficient to raise a question of fact as to whether RealPlus and REBNY agreed to block any further potential competitors from access to R.O.L.E.X.

### B.  Restraint of Trade

The second element of a section 1 claim is that the agreement constitutes an unreasonable restraint of trade.  Some types of agreements are so obviously anticompetitive that they are per se unreasonable restraints of trade.  For most agreements, however, the plaintiff must show that the agreement is an unreasonable restraint of trade under the rule of reason.  Plaintiff argues that defendants' conduct is an unreasonable restraint of trade under both the per se rule and under the rule of reason.

**1.  Per Se Rule**

Per se treatment is reserved for conduct like price fixing that is "so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values" that it can be "conclusively presumed illegal without further examination."  Capital Imaging Assocs. v. Mohawk Valley Med. Assocs., 996 F.3d 537, 542 (2d Cir. 1993); see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 127 S.Ct. 2705, 2713 (2007) ("Resort to per se rules is confined to restraints…that would always or almost always tend to decrease competition and reduce output.").  If a restraint is per se illegal, a court need not inquire into the "reasonableness of an individual restraint in light of the real market forces at work."  Leegin Creative, 127 S.Ct. at 2713.

Citing the Supreme Court's decision in Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212 (1959), plaintiff argues that defendants have engaged in a horizontal group boycott that constitutes a per se violation of section 1.  In the boycott context, however, the per se rule is limited to cases involving horizontal agreements among direct competitors.  NYNEX Corp. v.

Discon, Inc., 525 U.S. 128, 135 (1998).  Courts will give per se treatment to group boycotts where firms with a dominant position in the relevant market or unique access to a business element necessary for effective competition cut off access to a supply, facility, or market necessary for the plaintiff to compete without any plausible procompetitive justification. Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 294 (1985).

The Court need not now decide whether plaintiff's claims should be treated under the per se rule or the rule of reason.[1]  It is enough, at this point, to note that plaintiff cannot sidestep its obligation to identify and prove the relevant antitrust market.  Without knowing the relevant market, the Court cannot assess defendants' market power or whether access to a R.O.L.E.X. interface is an essential element for plaintiff to compete in the relevant market.  Thus we turn now to the rule of reason and analysis of the relevant market.

**2.  Rule of Reason**

Under the rule of reason, "plaintiff bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market." Capital Imaging, 996 F.2d at 543 (emphasis in original).  The burden then shifts to the defendants "to offer evidence of the pro-competitive 'redeeming virtues' of their combination." Id.  If the defendant comes forward with such proof, the burden shifts back to the plaintiff "to demonstrate that any legitimate collaborative objectives proffered by defendant could have been

---

[1] Plaintiff also argues that defendants' conduct should be subject to "quick look" analysis, citing Law v. NCAA, 134 F.3d 1010, 1020 (10th Cir. 1998).  In Law, the Tenth Circuit applied a truncated rule of reason analysis to an NCAA rule limiting salaries of graduate-assistant basketball coaches to $16,000, which it characterized as a horizontal price fix with obvious anticompetitive effect and summarily condemned without an analysis of the defendant's market power.  Id.  Here, unlike Law, plaintiff does not allege any agreement on prices in the market for listings IT services. "Quick look" treatment is inappropriate.

11

achieved by less restrictive alternatives, that is those that would be less prejudicial to competition as a whole." Id. It is then up to the factfinder to weigh the harms and benefits of the challenged behavior. Id. A plaintiff can satisfy its initial burden either by pointing to direct evidence of actual detrimental effects on competition, like reduced output or actual control over prices, or by showing that defendants possess sufficient market power in the relevant market that their "arrangement has the potential for genuine adverse effects on competition." Id. at 546 (quoting F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61 (1986)).

Plaintiff offers no direct evidence of actual detrimental effects on competition other than a bald assertion that REBNY "exercised actual control over prices when it set a very high price for using the e-mail/website access to send and receive RLS listings once or twice a day, thus compelling brokers to purchase Listings IT Services from [RealPlus] or OLR with real time access to RLS data for only slightly higher prices." (Pl. Mem. in Opp. at 27.) This type of showing is insufficient at the summary judgment stage. We turn therefore to analysis of the relevant market.

Defendants argue that the market for listings IT services is at least national in scope and therefore defendants do not have market power in the relevant market. Plaintiff argues that the Manhattan listings IT services market is a distinct market where RealPlus and OLR have substantial market share. Both sides have submitted expert reports supporting their market definitions and plaintiff argues that at the very least, a triable issue of fact as to the definition of the relevant market exists.

The relevant market "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956). The products or services need not

be identical to be part of the same market.  See id. at 394.  A court may define a market as "any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, *could profitably raise prices* significantly above the competitive level.  If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market."  AD/SAT, 181 F.3d at 228 (quoting 2A Areeda ¶ 533) (emphasis in opinion).  In analyzing the relevant market, courts consider a number of factors beyond the reasonable interchangeability of product and its claimed substitutes.  See Geneva Pharm. Tech. Corp. v. Barr Labs., Inc., 386 F.3d 485, 496 (2d Cir. 2004).  These factors include "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price change, and specialized vendors," Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962), as well as the existence of significant barriers to entry to the relevant market.  See Geneva Pharm., 386 F.3d at 499-500 (finding market for generic drug distinct from market for "therapeutically equivalent" brand name drug because, inter alia, high barriers to entry in generic market prevented potential competitors from offering substitutes).

      In this case, genuine issues of fact exist as to the definition of the relevant market.  Plaintiff argues that, even if the products are similar, substantial barriers to entry keep national listings IT services vendors from selling to brokerage firms in Manhattan.  Plaintiff argues that access to real time listings data from the RLS is essential for brokers to effectively compete in the Manhattan marketplace.  Therefore a listings IT services vendor must be able to develop an interface with R.O.L.E.X. and the ability to send and receive RLS listings in real time to be able to compete with RealPlus and OLR to sell listings management systems to brokers in Manhattan.  But the only way for a new entrant to obtain an interface with R.O.L.E.X. is for RealPlus to

agree to create it.  RealPlus has already shown that it is not inclined to create new interfaces by rejecting plaintiff's request and resisting OLR's and it has no rational reason to create interfaces with any new potential competitors.  These barriers to entry place RealPlus and OLR in a position where, if they formed a hypothetical cartel, they could profitably raise prices above the competitive level.  As long as REBNY continues to mandate exchange of listings through R.O.L.E.X., Manhattan brokers have no substitutes available.

Additional questions of fact exist with respect to the interchangeability of the products offered by Manhattan listings IT services vendors and national vendors.  Plaintiff's expert listed eight factors which he claims make Manhattan listings IT products different from the products offered in the national market.  Defendants' expert argues that the products share the same core functionality and that all of the differentiating features could be addressed through a small degree of customization making the products offered by national vendors adequate substitutes for the Manhattan market.  The experts disagree on the degree of customization that would be required to make the products interchangeable.  This is a question of fact for the jury.

Defendants argument that plaintiff cannot show antitrust injury because defendants lack market power depends on the definition of the relevant market.  If the jury were to find that the relevant market was the Manhattan listings IT services market, plaintiff has offered evidence that defendants' market share in that market is over 70% and potential competitors face high barriers to entry.  Therefore a jury reasonably could find that defendants have market power in the relevant market and from that infer that there was harm to competition.

Under the rule of reason analysis, once plaintiff has met its threshold burden, the burden shifts to the defendants to offer a procompetitive justification for their conduct.  Here, defendants argue that promoting the exchange of exclusive listings has substantial procompetitive effects in

the residential real estate brokerage market and choosing a single transmission standard makes the exchange more efficient. Plaintiff does not contest this. But a substantial question of fact exists as to whether defendants' purported justification for denying plaintiff and other potential competitors an interface with the R.O.L.E.X. system (that additional interfaces present technological difficulties, reduce efficiency, and increase the chance of errors) outweighed its anticompetitive effects.

Because substantial questions of fact exist with respect to concerted action, market definition, and procompetitive justifications, summary judgment on plaintiff's section 1 claims is inappropriate.

### III

Section 2 of the Sherman Act prohibits monopolization, attempted monopolization and conspiracy to monopolize any part of trade or commerce. 15 U.S.C. § 2. Plaintiff claims that defendants have attempted or conspired to monopolize both the Manhattan listings IT services market and the Manhattan residential brokerage services market.

#### A.  Claims of Monopolization of Manhattan Listings IT Services Market

Defendants argue that plaintiff's monopolization claims, whether for actual monopolization, attempted monopolization or conspiracy to monopolize, fail as a matter of law because liability under section 2 cannot rest on a theory of shared monopoly.

As the Eastern District explained in Flash Electronics, Inc. v. Universal Music & Video Distribution Corp., with respect to "claims of actual or attempted monopolization, the Second Circuit has specifically indicated that it will not entertain arguments based on a 'shared

15

monopoly' theory of liability." 312 F. Supp. 2d 379, 397 (E.D.N.Y. 2004) (citing H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1018 (2d Cir. 1989).

In the amended complaint, plaintiff alleges that there is a dangerous probability that defendants RealPlus *and* OLR will be able to establish a monopoly position in the Manhattan listings IT services market. (Amended Compl. ¶ 128.) This is a claim for actual or attempted monopolization based on a shared monopoly between RealPlus and OLR; as such, it must fail.

The complaint does not clearly allege a conspiracy to monopolize claim, but even if the Court were to construe it to raise allegations of conspiracy or allow plaintiff to amend the complaint, a claim of conspiracy to monopolize based on a shared monopoly between RealPlus and OLR would also fail as a matter of law. While the Second Circuit has not squarely addressed the question of whether a shared monopoly theory of liability is viable in the context of a conspiracy to monopolize, district courts in this and other circuits have expressed skepticism on the issue, even if they have stopped short of categorically rejecting the possibility of such a claim. See Flash Electronics, 312 F. Supp. 2d at 397. In Sun Dun Inc. of Washington v. Coca-Cola Co., 740 F. Supp. 381, 391-92 (D. Md. 1990), the court said that a claim of conspiracy to form a shared monopoly might be viable "if the aim of the conspiracy was to form a single entity to possess illegal market power," but if the goal of the conspiracy was to create a market environment where market power continued to be shared among the coconspirators as otherwise unrelated entities, no claim is stated under section 2. The Eastern District in Santana Products v. Sylvester & Associates, Ltd., 121 F. Supp. 2d 729 (E.D.N.Y. 1999), took a slightly more expansive view saying that "a claim for conspiracy to monopolize may also be stated where two or more competitors seek to allocate a market and exclude competitors, even if they do not form a single corporate entity," id. at 740 n.1, but absent an allegation that competition between the

monopolizing parties has diminished, a claim of conspiracy to form a shared monopoly must fail. Id. at 738; see also Flash Electronics, 312 F. Supp. 2d at 397.

In this case, plaintiff has not pointed to any evidence that RealPlus and OLR seek to form a single entity or that competition between them has diminished or that they have allocated customers.  In fact, defendants point to evidence that competition between the two defendants is robust and that RealPlus was forced to lower its prices in response to competition from OLR.  Even under the more permissive view in Santana Products, plaintiff cannot make out a claim for conspiracy to form a shared monopoly.  Defendants are therefore entitled to summary judgment on plaintiff's claims of actual monopolization, attempted monopolization, and conspiracy to monopolize the Manhattan listings IT services market.

### B.  Claims of Monopolization of Manhattan Residential Brokerage Services Market

Plaintiff alleges that the brokerage defendants violated section 2 by monopolizing or attempting to monopolize the Manhattan Residential Brokerage Services Market.  Plaintiff lacks standing to prosecute such a claim because it is neither a consumer nor a competitor in the relevant market.  See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 537-44 (1983); Illinois ex rel. Ryan v. Brown, 227 F.3d 1042, 1046 (7th Cir. 2000) ("normally only consumers or competitors have standing").  Plaintiff does not buy or sell residential brokerage services.  As vendor of IT services whose customers are competitors in the relevant market, plaintiff is too remote a party to have antitrust standing.

Even if plaintiff did have standing, the claim is one of shared monopoly and would fail for the same reasons plaintiff's claim for monopolization of the Manhattan listings IT services market fails.

**IV**

Plaintiff also brings two state law claims: (1) violation of New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, and (2) tortious interference with economic relations.

The Donnelly Act is generally construed in accordance with the federal Sherman Act, see Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp., 224 F. Supp. 2d 657, 677-78 (S.D.N.Y. 2002), and the two acts require identical elements of proof for claims of monopolization. See Int'l Television Prods. Ltd. v. Twentieth Century-Fox Film Corp., 622 F.Supp. 1532, 1540 (S.D.N.Y. 1985). Accordingly, to the extent that defendants are entitled to summary judgment under section 2 of the Sherman Act, they are also entitled to summary judgment for monopolization claims under the Donnelly Act. To the extent that plaintiff's Donnelly Act claims track its claims under section 1 of the Sherman Act, defendants are not entitled to summary judgment.

An essential element of a claim for tortious interference with economic relations in New York is that the defendant acted solely out of malice and not simply in pursuit of normal economic self interest. See Carvel Corp. v. Noonan, 3 N.Y.3d 182,190 (2004). Plaintiff does not even allege that defendants' actions were solely for the purpose of inflicting intentional harm on plaintiff, let alone point to evidence to support such a claim. In its opposition brief, plaintiff acknowledges that defendants were acting in their own economic self interest to advance the business interests of RealPlus. (Pl.'s Mem. in Opp. at 35.) A showing that defendants acted in their competitive self interest does not demonstrate the requisite motive to prove tortious interference. See Carvel, 3 N.Y.3d at 191. Accordingly defendants are entitled to summary judgment on the tortious interference claim.

V

Defendants have alerted the Court to the fact that plaintiff named Prudential Real Estate Affiliates, Inc. and William B. May Co., R.E. Inc. as defendants in the amended complaint but never effected service on them. Defendants ask that the court dismiss these two parties from the action pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. Plaintiff has not opposed this request. Accordingly Prudential Real Estate Affiliates, Inc. and William B. May Co., R.E. Inc. are dismissed from the action.

Finally, defendants moved to strike portions of the summary judgment record as irrelevant or inadmissible. The Court having relied on none of the material that is the subject of the motion to strike, that motion is denied as moot in light of the disposition of the defendants' summary judgment motion.

VI

For the reasons set forth above, defendants' motion for summary judgment is granted in part and denied in part. Defendants' motion for summary judgment on plaintiff's claims under section 1 of the Sherman Act is denied. Summary judgment is granted in favor of defendants on plaintiff's section 2 claims. Summary judgment is granted in favor of defendants on the Donnelly Act claims to the extent that those claims track plaintiff's claims under section 2 of the Sherman Act. Summary judgment is granted in favor of defendants on plaintiff's state law tort claims. Prudential Real Estate Affiliates, Inc. and William B. May Co., R.E. Inc. are dismissed from the action. Defendants' motion to strike is denied as moot.

The parties are directed to submit a pretrial order by September 4, 2007.

**SO ORDERED.**

Dated: New York, NY
 August 6, 2007

_____
U.S.D.J.